IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**Manuel A. García-González**
Plaintiff

v.

**Juan C. Puig-Morales**
Defendant

Civil No. 10-1462 (DRD)

**OPINION AND ORDER**

Pending before the Court is Plaintiff's *Motion for Reconsideration* (Docket No. 77) as to the *Amended Opinion and Order* issued by the Court on September 29, 2011 (Docket No. 76), whereby Plaintiff's motion for partial summary judgment was denied and co-defendant Juan C. Puig-Morales' ("Puig") request to dismiss Plaintiff's Fourteenth Amendment claim was granted for Plaintiff's lack of a constitutionally protected property interest. Also pending before the Court is Puig's motion for summary judgment as to Plaintiff's First Amendment claim (Docket Nos. 84 and 87).

For the reasons set forth below, Plaintiff's Motion for Reconsideration is **DENIED**, and Puig's motion for summary judgment is **GRANTED** as to Plaintiff's remaining causes of action. Therefore, Plaintiff's claim is hereby **DISMISSED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The relevant facts are taken from the Court's *Amended Opinion and Order* (Docket No. 76), the statements of uncontested material facts submitted by the parties (Docket Nos. 31-1, 49, 85, 87, 90-1 and 90-2) and other relevant documents in the Court's record.

Since before 2008, Plaintiff had held various annual contracts with the Puerto Rico Department of Treasury ("Treasury") for the acquisition of insurance policies for various government agencies. On October 1, 2008, Plaintiff entered into a one-year professional services contract with Treasury for the acquisition of insurance policies for the Public Buildings Authority, the Americas Port Authority, the Administration of General Services, and the Commonwealth's "Portal del Futuro" Public Corporation (the "2008 Insurance Contract"). The termination date of the 2008 Insurance Contract was set on

September 30, 2009, but it could be terminated at an earlier date by either party with a 30-day advance written cancellation notice.

In a letter dated March 20, 2009, Treasury sent Plaintiff a written cancellation notice for the termination of the 2008 Insurance Contract on May 30, 2009. The letter also informed that Treasury would be issuing a public notice for a new Request for Proposal ("RFP") for the Risk Administration and Insurance Administration Program and that Plaintiff would be able to submit its bid for the same. (Docket No. 40-2).

On March 26, 2009, Treasury published the RFP announcement for the acquisition of insurance policies for the Commonwealth of Puerto Rico and its instrumentalities, which applications would have to be received at Treasury between March 25, 2009 and April 17, 2009. The official RFP document contained the terms and conditions that would govern the RFP adjudication proceedings. (Docket No. 40-3). Plaintiff submitted his proposal within the prescribed deadline.

On May 15, 2009, Treasury issued an adjudication notification to Plaintiff informing him to be favorably considered by the evaluating board for the issuance of insurance policies to the following government agencies and insurance premiums: (1) Administration of Corrections, $1,925,476; (2) Administration of Juvenile Institutions, $400,986; (3) Department of Education, $5,553,908; and (4) Puerto Rico Institute of Technology, $1,000,000; for a total of $7,881,350 in insurance premiums ("2009 Adjudication Notification"). The 2009 Adjudication Notification further stated the subsequent steps and deadlines for the final acceptance of the adjudication and the execution of the contract. (Docket No. 40-5).

On May 18, 2009, Treasury received Plaintiff's timely acceptance of the adjudication. Soon thereafter, Treasury received the complementary documents necessary for the execution of the new insurance contract, pursuant to the specifications of the 2009 Adjudication Notification.

On May 28, 2009, Plaintiff received a letter from Treasury whereby Plaintiff was informed of "countless errors" in issuing the 2009 Adjudication Notification sent to Plaintiff, as well as in "other letters […] issued [to other bidders]" and that Treasury would notify Plaintiff "of a new meeting date for the distribution of the corrected letters." (Docket No. 40-8).

The Court notes that neither Treasury nor Puig have specified which were the alleged "countless errors" found in any of the adjudication notifications issued pursuant to the March 26, 2009 RFP announcement, how Treasury became aware of such errors, nor the steps taken by Treasury to correct the same. There is also no information on the record as to the referenced errors other than the assertion that there were "countless errors." The Court also noted that Plaintiff was not advised as to how the referenced errors affected Plaintiff's adjudication or whether he had rights to an informal proceeding to discuss the merits of Treasury's determination to re-issue Plaintiff's adjudication notification.

Despite the information included in the letter received on May 28, 2009, Plaintiff never received a corrected adjudication notification. Nonetheless, he was presented with a contract for significantly less insurance policy premiums than those awarded on May 15, 2009. Plaintiff refused to sign that contract.

On May 26, 2010, Plaintiff filed the complaint in the instant case against Juan C. Puig-Morales, Secretary of the Treasury for the period relevant to the instant case, and Ramón L. Cruz Colón, Insurance Commissioner for the period relevant to the instant case,[1] (collectively, "Defendants") seeking declaratory and injunctive relief pursuant to Section 1983 for violations of his constitutionally protected rights under the First and Fourteenth Amendments of the Constitution of the United States, specifically for being the victim of political discrimination. Plaintiff also seeks damages for violations to Article 1802 of the Puerto Rico Civil Code.

Defendants filed their answer on September 6, 2010, alleging, in general, that Plaintiff failed to state a prima facie case of political discrimination because there is no causal link between the alleged deprivation of Plaintiff's rights and Defendants. Defendants also content that they are entitled to qualified immunity. (Docket No. 10).

On February 9, 2011, Plaintiff filed a Motion for Partial Summary Judgment against Puig in connection with Plaintiff's due process claim. In its motion for partial summary judgment, Plaintiff alleged that he "had a legitimate claim of entitlement to the signing of the relevant contracts," that he

---

[1] On June 30, 2011, Plaintiff voluntarily dismissed his claims against Ramón L. Cruz Colón. (Docket No. 72).

"was entitled to a pre-deprivation proceeding before [Defendant] materially changed the terms of the adjudication" and that "[Puig's] failure to afford any type of hearing whatsoever constitutes a violation of plaintiff's First Amendment rights."  (Docket No. 31).

On April 1, 2011, Defendants opposed Plaintiff's motion for partial summary judgment on the grounds that: (1) Plaintiff's expectation does not amount to a vested property interest in the signing of the insurance brokerage contract; (2) the Parratt-Hudson doctrine bars relief under the Due Process clause because Plaintiff had post-deprivation remedies available to address Treasury's allegedly adverse determination; (3) Plaintiff had failed to show that Puig was personally and directly involved in causing the violation of Plaintiff's alleged federally protected rights as required in a claim under Section 1983; and (4) Puig is entitled to qualified immunity in connection with Plaintiff's due process claim. Thus, Puig requested the dismissal of Plaintiff's due process claim.  (Docket No. 48).

On September 29, 2011, after various procedural incidents, the Court issued an *Amended Opinion and Order* denying Plaintiff's motion for partial summary judgment.  The Court concluded that Plaintiff failed to identify a constitutionally protected property interest.  (Docket No. 76).  The Court's reasoning was based on Redondo-Borges v. U.S. Dept. of Housing and Urban Development, 421 F.3d 1 (1st Cir. 2005), whereby the First Circuit held that a bidder's interest in the bid award does not rise to the level of a constitutionally protected property interest when the bidder claims a property interest in the bid award for a project that was later revoked by the government agency.

On September 30, 2011, Plaintiff filed a motion for reconsideration, alleging that the Court misplaced its reliance in the Redondo-Borges' holding and alleging that "nothing in the Redondo-Borges decision bars the due process claims asserted in the instant action" (Docket No. 77, page 4) because, unlike the instant case, the plaintiffs in the Redondo-Borges case "were not the beneficiaries of an RFP adjudication that explicitly expressed the finality of said adjudication."  (Docket No. 77, page 3). Further, Plaintiff contends that no existing First Circuit case law "precludes plaintiff's legitimate expectancy that his adjudication would be final, as per the express terms of the RFP, [and that he should be warranted] procedural due process protection" (Docket No. 77, page 4).

On October 10, 2011, Puig filed an opposition to Plaintiff's Motion for Reconsideration. (Docket No. 78). In his opposition, Puig alleged that Plaintiff "failed to identify a cognizable property interest in the expectation to sign a government contract," that Plaintiff failed to show that Puig "was involved in the deprivation of his constitutional rights," "that the Parratt-Taylor doctrine applies to this case," and that, in the alternative, Puig "is entitled to the qualified immunity defense given that at the time of the events alleged in the complaint the law was not clearly established as to whether there is a property interest prior to the signing of the contract which confers the property interest." (Docket No. 78).

On October 18, 2011, Plaintiff filed a reply to Puig's opposition to the motion for reconsideration. (Docket No. 79). Plaintiff re-alleges his causes of action stating that Plaintiff "has not been provided any legitimate reason as to why he was deprived of his interest over what was clearly a final adjudication", that "[t]his deprivation occurred without plaintiff been afforded adequate notice of the basis for it nor been afforded the opportunity to be heard on the matter," constituting a "quintessential example of a due process violation." (Docket No. 79, pages 2-3).

On November 18, 2011, Plaintiff supplemented his motion for reconsideration. (Docket No. 80). In said motion, Plaintiff proffered a letter of November 17, 2011 received from the Legal Affairs Office of Treasury and a Certification dated November 14, 2011, whereby the Contracting Division of Treasury's Public Insurance Office certifies that there are no documents in their records "regarding any investigation into the alleged irregularities identified in the original notices of the adjudication RFP;" no "[l]etters [notifying] all proponents of problems/ irregularities with their initial adjudications to the RFP proponents;" no "documents reflecting any measures taken by [Treasury] to remedy, fix or correct the purported errors in the RFP adjudication or to otherwise deals with [the] alleged errors;" no copies "of the amended notice of adjudication to any of the proponents;" and no "[d]ocuments relating to the Secretary's second adjudication of contracts under the RFP." (Docket No. 80-2). The Certification is proffered for Plaintiff's proposition of "the **absolute arbitrariness** of the material alteration of the adjudication of insurance account [against] the plaintiffs, as [there] is no record of any problem ever been identified in the adjudication of the RFP, any measure taken to correct such problems or any evidence that there was any rhyme or reason for the Secretary's actions." (Docket No. 80, page 2).

On December 2, 2011, Puig filed a motion for summary judgment and memorandum in support thereof, together with a statement of uncontested material facts as to Plaintiff's First Amendment claim (Docket Nos. 84 and 85). Puig avers that Plaintiff has no cause of action under the First Amendment because Plaintiff did not prove that Puig had actual knowledge of Plaintiff's political affiliation. Puig also alleged that even if Plaintiff had a valid claim under the First Amendment, he is entitled to qualified immunity. Lastly, Puig requested the dismissal of Plaintiff's supplemental claims under state law for his failure to state a federal claim. Puig supplemented the motion for summary judgment on December 5, 2011 as to his lack of personal involvement in the decision to revoke the 2008 Insurance Contract, his lack of knowledge of Plaintiff's political affiliation, and as to Puig's lack of affiliation with the New Progressive Party (Docket No. 87).

On January 25, 2012, Plaintiff opposed Puig's motion for summary judgment (Docket No. 90). In his opposition, Plaintiff proffered evidence that Puig was responsible for the decisions regarding the 2008 Insurance Contract as the nominating authority pursuant to Article 12.020 of the Puerto Rico Insurance Code, 26 L.P.R.A. § 1202,[2] and that he was personally involved in making such decisions (Docket Nos. 90, page 3; 90-2 ¶ 2; and 92-1, lines 5-12 on page 3).[3] Further, as to Puig's alleged lack of knowledge of Plaintiff's political affiliation, Plaintiff avers that other insurance brokers known to be affiliated with the New Progressive Party were favored in Treasury's adjudication of the insurance contracts. (Docket Nos. 90, pages 4-5, 90-2, ¶4 and 90-5).[4]

---

[2]  Article 12.020 of the Puerto Rico Insurance Code grants the Secretary of Treasury the responsibility to "procure and contract insurance for the Commonwealth, […] its municipalities [… and] the public corporations and authorities of the Commonwealth." 26 L.P.R.A. § 1202.

[3]  Plaintiff proffered copies of a deposition taken on August 19, 2011 for a state court proceeding regarding the procedure for the designation of insurance contracts for the Puerto Rico Electric Power Authority. In his testimony, Puig admitted to "having to make the determinations as to **who** is going to be granted certain professional services contracts and **who is not**" based on the recommendations of persons working in the relevant areas and his "sound judgment and [his] own criteria." (Docket No. 92-1, page 3) (Emphasis ours).

[4]  Plaintiff proffered a copy of a Certification Regarding the Execution of Contracts, Deeds and Other Related Documents issued by the Office of the Comptroller as to a contract for the acquisition of insurance contracts effective May 29, 2009 thru May 28, 2010 between Treasury and Lone Star Insurance Producers, Inc. for $1,363,813. Plaintiff further alleged that the principal officers of Lone Star Insurance Producers were known affiliates of the New Progressive Party. (Docket No. 90-5).

## II. LEGAL STANDARDS

### A. Standard of Review for Motions for Reconsideration

Motions for reconsideration are generally considered either under Rules 59 or 60 of the Federal Rules of Civil Procedure, depending on the time when such motion is served. *See* Perez-Perez v. Popular Leasing Rental, Inc., 993 F.3d 281, 284 (1st Cir. 1993). It is further accepted that "[a] motion for reconsideration does not provide a vehicle for a party to undo its own procedural failures and it certainly does not allow a party to introduce new evidence or advance new arguments that could or should have been presented to the district court prior to judgment." Marks 2-Zet-Ernst Marks GMBH & Co. KG v. Presstek, Inc., 455 F.3d 7, 15-16 (1st Cir. 2006). Thus, a motion for reconsideration cannot be used as a vehicle to re-litigate matters already litigated and decided by the Court. *See* Standard Quimica de Venezuela v. Central Hispano Int'l, Inc., 189 F.R.D. 202 n. 4 (D.P.R. 1999).

These motions are entertained by courts if they seek to correct manifest errors of law, present newly discovered evidence, or when there is an intervening change in law. *See* Prescott v. Higgins, 538 F. 3d 32, 45 (1st Cir. 2008); *see also* Rivera Surillo & Co. v. Falconer Glass Indus., Inc., 37 F.3d 25, 29 (1st Cir. 1994) (citing F.D.I.C. Ins. Co. v. World University, Inc., 978 F.2d 10, 16 (1st Cir. 1992)). A motion for reconsideration is unavailable if said request simply brings a point of disagreement between the court and the litigant, or reargues matters already properly disposed of by the Court. *See e.g.* Waye v. First Citizen's National Bank, 846 F.Supp. 310, 314 n.3 (M.D.Pa. 1994). The Court finds that there is an intervening change in law, but that it favors Puig (see discussion at Section III, *infra*).

### B. Motion for Summary Judgment

A motion for summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, which entitles a party to judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." *See* Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008) (citing Thompson v. Coca–Cola Co., 522 F.3d 168, 175 (1st Cir. 2008)); *see also* Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248-250 (1986); Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (stating that an issue is genuine if it can be resolved in favor of either party). In order for a disputed fact to be considered "material" it must have the potential "to affect the outcome of the suit under governing law." Sands v. Ridefilm Corp., 212 F.3d 657, 660–661 (citing Liberty Lobby, Inc., 477 U.S. at 247–248); Prescott, 538 F.3d at 40 (citing Maymí v. P.R. Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008)).

The purpose of the summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997) (citing Fed.R.Civ.P. 56(e) advisory committee note to the 1963 Amendment). The moving party must demonstrate the absence of a genuine issue as to any outcome-determinative fact on the record. Shalala, 124 F.3d at 306. Upon a showing by the moving party of an absence of a genuine issue of material fact, the burden shifts to the nonmoving party to demonstrate that a trier of fact could reasonably find in his favor. Id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The non-movant may not defeat a "properly focused motion for summary judgment by relying upon mere allegations," but rather through definite and competent evidence. Maldonado–Denis v. Castillo Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). The non-movant's burden thus encompasses a showing of "at least one fact issue which is both 'genuine' and 'material.'" Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990); *see also* Suarez v. Pueblo Int'l., 229 F.3d 49, 53 (1st Cir. 2000) (stating that a non-movant may shut down a summary judgment motion only upon a showing that a trial-worthy issue exists). As a result, the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." Liberty Lobby, Inc., 477 U.S. at 247–248. Similarly, "summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

When considering a motion for summary judgment, the Court must examine the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor in order to conclude whether or not there is sufficient evidence in favor of the non-movant for a jury to return a verdict in its favor. Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002). The

Court must review the record as a whole and refrain from engaging in an assessment of credibility or weigh the evidence presented. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135 (2000). The burden placed upon the non-movant is one of production rather than persuasion. In other words, in weighing a non-movant's opposition to summary judgment the Court should not engage in jury-like functions related to the determination of credibility.

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Reeves v. Sanderson Plumbing Prod., 530 U.S. 133, 150 (2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250–251 (1986)). Summary judgment is inappropriate where there are issues of motive and intent as related to material facts. *See* Poller v. Columbia Broad. Sys., 368 U.S. 464, 473 (1962) (summary judgment is to be issued "sparingly" in litigation "where motive and intent play leading roles"); *see also* Pullman–Standard v. Swint, 456 U.S. 273, 288 (1982) ("[F]indings as to design, motive and intent with which men act [are] peculiarly factual issues for the trier of fact."); Dominguez–Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 433 (1st Cir. 2000) (finding that "determinations of motive and intent ... are questions better suited for the jury").

Conversely, summary judgment is appropriate where the nonmoving party rests solely upon "conclusory allegations, improbable inferences and unsupported speculation." Ayala–Gerena v. Bristol Myers–Squibb Co., 95 F.3d 86, 95 (1st Cir. 1996).

### III. PLAINTIFF'S FOURTEENTH AMENDMENT CLAIM

As briefly stated above, the basis for Plaintiffs motion for reconsideration of the *Amended Opinion and Order* (Docket No. 76) is the Court's alleged misapplication of Redondo-Borges, *supra*, to the facts of the instant case, and the alleged lack of First Circuit case law precluding Plaintiff's entitlement to procedural due process protection for his expectancy that the 2009 Adjudication Notification would be final. Plaintiff's contentions are erroneous.

Plaintiff's Fourteenth Amendment claim is based on Plaintiff's belief that he is entitled to predeprivation procedural due process before Treasury prior to changing the terms of the 2009

Adjudication Notification because he had timely accepted the adjudication. In the Court's *Amended Opinion and Order*, the Court, relying on Redondo-Borges, *supra*, made abundantly clear that the binding precedent in the First Circuit provides that a bid award does not rise to the level of a constitutionally protected property interest when the bidder claims a property interest in the bid award for a project that was later revoked by the government agency. Despite the factual differences Plaintiff identified as to Redondo-Borges and the case at bar, the legal conclusions remain unchanged as to Plaintiff's lack of a constitutionally protected property interest in a mere adjudication of a government contract.

Before Redondo-Borges was resolved, the First Circuit had already determined that "[a]ward procedures are not designed to establish private entitlements to public contracts." Smith & Wesson, Div. of Bangor Punta Corp. v. U.S., 782 F.2d 1074, 1081 (1st Cir. 1986). The First Circuit also concluded that "[i]n the context of government procurement contracts," such as the insurance contract at stake, "**a liberty interest requiring due process protection arises only when a company is barred from the procurement process, or eliminated from it, because of charges of fraud or dishonesty made without an opportunity for a hearing on those charges**." Id. (Emphasis ours).

In the instant case, Plaintiff was not barred from the procurement process nor eliminated on the basis of charges of fraud or dishonesty. By his own admission, Plaintiff conceded to being offered a contract for the acquisition of insurance contracts after the original terms of the 2009 Adjudication Notification were changed. (Docket No. 1, ¶3.18). Further, the reason proffered by Treasury as to the denial of the 2009 Adjudication Notification were Treasury's errors in the adjudication notifications that were sent to Plaintiff and to other insurance brokers (Docket No. 84, page 2). Although receiving a significantly lower number of insurance contracts, Plaintiff was not left without any government contract for the acquisition of insurance contracts. Nonetheless, even if Plaintiff had been barred from the bidding process, he would not have been entitled to predeprivation procedural due process pursuant to the Parratt-Hudson doctrine, as recently decided by the First Circuit.

The First Circuit, in a recent *en banc* opinion in a suit of alleged procedural due process violation, upheld that predeprivation procedural due process is not required under the Parratt-Hudson

doctrine[5] if there are adequate postdeprivation remedies available to a plaintiff.  See San Geronimo Caribe Project, Inc. v. Acevedo-Vilá, 687 F.3d 465, 480 (1st Cir. 2012).  "In the ordinary case where an injury has been caused not by a state law, policy, or procedure, but by a random and unauthorized act that can be remedied by state law, there is no basis for federal court intervention under § 1983" in a suit alleging a procedural due process claim.  Id. (citing Albright v. Oliver, 510 v. 266, 285 (1994)).

In the case at bar, Plaintiff was awarded a bid to sell insurance contracts to certain central government entities as described in the 2009 Adjudication Notification.  Subsequent to Plaintiff's timely acceptance of the 2009 Adjudication Notification, Treasury unilaterally modified its terms as to the number of insurance contracts that Plaintiff would be able to sell.  The bidding process and adjudication was conducted pursuant to Regulation No. 29 of the Government's Central Accounting Area of Treasury, dated October 15, 2001 ("Regulation 29"), which was registered in the Puerto Rico Department of State as Regulation No. 6363.  Article 13 of Regulation 29 provides postdeprivation remedies for challenging any determination made by the Secretary of Treasury under said regulation.  Further, the Uniform Administrative Procedure Act, 3 L.P.R.A. § 2101, et. seq., also provides postdeprivation remedies to challenge Treasury's unilateral modification of the 2009 Adjudication Notification via judicial review of the administrative determination.  3 L.P.R.A. §§ 2171 - 2177.  Thus, the Court concludes that Plaintiff had adequate postdeprivation remedies available to challenge Treasury's actions with respect to the 2009 Adjudication Notification.

Therefore, based on San Geronimo, *supra*, Plaintiff was not entitled to predeprivation procedural due process pursuant to the Parratt-Hudson doctrine.  Consequently, the Court finds no basis for federal court intervention as to Plaintiff's Fourteenth Amendment claim.  See Id., at 480.

Based on the above, the Court concludes that Plaintiff failed to show a manifest error of law, newly discovered evidence, or an intervening change in law that would warrant granting a motion for reconsideration as to his Fourteenth Amendment claim.

---

[5]  The doctrine set in Parratt v. Taylor, 451 U.S. 527 (1981) and Hudson v. Palmer, 468 U.S. 517 (1984) stand for the proposition that, the state is not in a position to provide meaningful predeprivation process when the state cannot anticipate or control when the deprivation would be made, whether negligent or intentional.

## IV. PLAINTIFF'S FIRST AMENDMENT CLAIM

The Supreme Court has made clear that the government cannot withhold a benefit if the decision to withhold is based on unconstitutional grounds even in the absence of a contractual right. *See* Perry v. Sindermann, 408 U.S. 593, 596-97 (1972). The Government may not deny a benefit to a person on a basis that infringes his constitutionally protected interests – especially, his interest in freedom of speech, which includes freedom to support a particular political party and/ or freedom of affiliation to a particular political party. *See* NAACP v. Button, 371 U.S. 415, 430 (1963); Bates v. Little Rock, 361 U.S. 516, 522-523 (1960); NAACP v. Alabama, 357 U.S. 449, 460-461 (1958). *See also* Cortes-Reyes v. Salas-Quintana, 608 F.3d 41 (1st Cir. 2010); Welch v. Ciampa, 542 F.3d 927, 939 (1st Cir. 2008) (all standing for the proposition that the freedom to support a particular political party is integral to the freedom of association and freedom of political expression that are protected by the First Amendment).

Further, in Board of County Commissioners v. Umbehr, 518 U.S. 668, 679 (1996), the Supreme Court concluded that the balancing test of Pickering v. Board of Education, 391 U.S. 563 (1968), applies to government independent contractors if such test is adjusted to weigh the government's interests as contractor rather than as employer. The United States Supreme Court originated a test in Pickering, *supra*, applicable in employment retaliation cases, to balance the public employee's free speech rights against the public employer's interest in operational efficiency. The Pickering balancing test requires the court's consideration of the following elements: (1) demonstration that the public employee's speech addressed matters of public interest and concern; (2) demonstration that the public employee's speech was a significant or motivating factor in the employer's decision; and (3) balancing the interests of the public employee on matters of public concern as a citizen and the public employer in promoting efficiency of public service. Umbehr also held that the government may not terminate an independent contractor's business relationship in order to retaliate against the contractor for the exercise of his political association right if the independent contractor can demonstrate a pre-existing commercial relationship with the government. Umbehr, 518 U.S. at 685. *See also* O'Hare Truck Service v. City of Northlake, 518 U.S. 712 (1996). The conclusions of law made by the Supreme Court

in Perry, O'Hare, and Umbehr as to the government exercising its contractual power over independent contractors can be summarized as follows:

> [(1)] the government cannot deny a governmental benefit or contract if it bases that decision on unconstitutional grounds [; (2)] the First Amendment protects any entity or person (who has been denied a benefit on unconstitutional grounds) if that person has a pre-existing commercial relationship with the government [; (3)] an actual contract is not needed [and (4)] the Supreme Court has refused to extend First Amendment protection to bidders or applicants of government contracts [that cannot demonstrate that they had a pre-existing commercial relationship with the government].

PRISMA v. Calderón, 162 F.Supp.2d 1, 7 (D.P.R. 2001) (quoting Perry, O'Hare, and Umbehr as to the first three items and McClintock v. Eichelberger, 169 F.3d 812 (3rd Cir. 1999) as to the fourth).

Thus, in order for an independent contractor to prevail in a complaint for the termination or non-renewal of a government contract in retaliation for exercising his protected freedom of speech, the independent contractor must show that the termination of his government contract was motivated by his speech as a citizen on a matter of public concern rather than on matters only of personal interest. If the independent contractor can show that he spoke as a citizen on a matter of public concern, the possibility of a First Amendment claim arises, and the question then becomes whether the government entity had an adequate justification for treating the independent contractor differently from any other member of the general public. See Garcetti v. Ceballos, 547 U.S. 410 (2006). The government entity will have a valid defense if it can show (by a preponderance of the evidence) that, in light of their knowledge, perceptions, and policies at the time of the termination, the government entity would have terminated the contract regardless of the independent contractor's speech. The government entity will also prevail if it can persuade the court that their legitimate interests as contractor outweigh the free speech interests at stake. See Umbehr, 518 U.S. at 685. On the other hand, if the independent contractor spoke on matters of personal interest, **the independent contractor has no First Amendment cause of action based on the government entity's reaction to the speech**. See Garcetti, *supra*.

In determining the appropriate remedy that may be granted to the independent contractor should he prevail, the court must consider whether the government entity discovered facts after termination that would have let to a later termination (despite the independent contractor's protected

speech), in addition to any evidence of mitigation of the independent contractor's loss by means of subsequent government contracts. *See* Umbehr, 518 U.S. at 685. "In making this analysis, a court should grant deference to the government's reasonable evaluations of its interest as a contractor." Wehran-Puerto Rico, Inc. v. Municipality of Arecibo, 106 F.Supp.2d 276, 283 (D.P.R. 2000) (citing Umbehr, 518 U.S. at 678).

In the instant case, Plaintiff alleged that "on the years prior to the Fortuño administration, plaintiff García had held several contracts to acquire insurance policies for the government." (Docket No. 1, ¶3.3). Plaintiff did not provide additional details to specify the period over which he held the insurance contracts referenced in his claim or the number of contracts executed throughout such period. Thus, pursuant to Rule 201 of the Federal Rules of Evidence,[6] the Court, on its own, takes judicial notice of the information included in the Internet site of the Registry of Contracts of the Puerto Rico Office of the Comptroller[7] as to the contracts executed by the central government and municipal entities. *See* 2 L.P.R.A. §97.[8] The Registry of Contracts shows a list of eight contracts executed between Plaintiff and Treasury for the purchase of insurance contracts, as follows:[9]

| Contract No. | Date of Execution | Beginning Date | Ending Date | Contract Amount |
|---|---|---|---|---|
| 2001-000118 | 9/5/2001 | 4/28/2001 | 4/27/2002 | $121,678.98 |
| 2001-000118 A[10] | 4/28/2002 | 4/29/2002 | 7/31/2002 | $0.00 |
| 2003-000150 | 9/12/2002 | 8/1/2002 | 7/31/2003 | $382,542.00 |
| 2004-000186 | 10/1/2003 | 10/1/2003 | 9/30/2004 | $534,172.00 |
| 2005-000200 | 11/4/2004 | 10/1/2004 | 9/30/2005 | $534,172.00 |

---

[6] Under Rule 201 of the Federal Rules of Evidence, the Court may, on its own, take judicial notice to adjudicative facts that are not subject to reasonable dispute because they can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

[7] *See* Gent v. CUNA Mut. Ins. Society, 611 F.3d 79, 84 n.5 (1st Cir. 2010) and Denius v. Dunlap, 330 F.3d 919, 926-27 (7th Cir.2003) (taking judicial notice of information from official government Internet site).

[8] 2 L.P.R.A. § 97 requires that all central government entities and municipal entities maintain a registry of all contracts executed by such entities and that they remit a copy of such contracts (with a few exceptions) to the Office of the Comptroller.

[9] Registry of Contracts search by "Government Entity," "Type of Contract" and "Party Name," at the Internet site of the Puerto Rico Office of the Comptroller, http://www.ocpr.gov.pr/indice_registro_de_contratos.htm (follow "Búsquedas y Consultas Estadísticas" hyperlink; select "Por Nombre de Entidad" from the "Tipo de Búsqueda" drop-down menu; then, select "Departamento de Hacienda" from the "Agencia" drop-down menu; then, select "Adquisición de Seguros" from the "Tipo de Contrato" drop down menu; and then type "Manuel A. Garcia" at "Nombre del Contratista;" lastly, press the "Buscar" button).

[10] This item represents an amendment to Contract No. 2001-000118, which, although does not involve a nominal contract amount, extended the validity of the contract from April 27, 2002 to July 31, 2002.

| | | | | |
|---|---|---|---|---|
| 2006-000216 | 10/1/2005 | 10/1/2005 | 9/30/2006 | $779,590.00 |
| 2008-000238 | 1/18/2008 | 10/1/2007 | 9/30/2008 | $16,298,136.00 |
| 2009-000173 | 10/1/2008 | 10/1/2008 | 9/30/2009[11] | $756,226.00 |

The list reveals a pattern of annual contracting between Plaintiff and Treasury for the acquisition of insurance policies during the eight years and one month that commenced on April 28, 2001 and ended on May 30, 2009. This period was interrupted only by a two-month gap in 2003 (i.e., August and September of 2003) between contract number 2003-000150 and number 2004-000186, and includes the duration of the contract subject of the instant complaint, as explained in note 11 of the instant *Opinion and Order*.

Thus, based on Plaintiff's un-contradicted allegation as to the insurance contracts held with Treasury "on the years prior to the Fortuño administration" and the corroborating evidence found in the Registry of Contracts of the Puerto Rico Office of the Comptroller, the Court concludes that Plaintiff had a pre-existing commercial relationship with Treasury prior to the cancellation of the 2008 Insurance Contract and the subsequent unilateral modification of the 2009 Adjudication Notification. Therefore, the Court can apply the adjusted Pickering test to determine if Plaintiff has a First Amendment cause of action.

Based on the above, Plaintiff must show that Treasury's termination of the 2008 Insurance Contract and the subsequent unilateral modification of the 2009 Adjudication Notification was in retaliation for exercising his speech as a citizen on a matter of public concern instead of a matter of personal interest. In this respect, Plaintiff avers that the motivating factor for Treasury's adverse actions was Plaintiff's political affiliation, which is opposite to Puig's political affiliation.[12] The Court fails to see how the political affiliation of Plaintiff, one of many insurance brokers selling insurance contracts to central government entities, should be construed as a matter of public concern. Instead, Plaintiff's political affiliation is clearly an issue of personal interest only to himself and to nobody else. Thus, in

---

[11] Contract No. 2009-000173 is the contract subject of the instant complaint. The "Ending Date" corresponds to the original terms of the contract, since the record shows the contract was terminated effective May 30, 2009. (Docket No. 1).

[12] The Court notes that Plaintiff did not proffer evidence as to Puig's personal knowledge of Plaintiff's political affiliation with the Popular Democratic Party, or that Puig, himself, was affiliated to the New Progressive Party ("NPP"). Indeed, Puig proffered a sworn statement affirming that he was not affiliated with the NPP. (Docket No. 87-2).

examining the facts in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, as we must, the Court concludes that there is no sufficient evidence in favor of Plaintiff showing a First Amendment cause of action based on Treasury's termination of the 2008 Insurance Contract and the subsequent unilateral modification of the 2009 Adjudication Notification.

## V. PLAINTIFF'S STATE LAW CLAIMS

Federal courts by their very nature are courts of limited jurisdiction. *See* Exxon Mobil Corp. v. Allapattah Servs., 545 U.S. 546, 552 (2005) (quoting Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994)). The presumption is that a federal court lacks jurisdiction. Kokkonen, 511 U.S. at 377. Consequently, the burden is on the plaintiff, who claims jurisdiction, to affirmatively allege and prove jurisdiction. Id. To bring a civil action within the court's subject matter jurisdiction, a plaintiff must allege that its action "requires the resolution of a substantial question of federal law," City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156 (1997); or that its action involves diversity jurisdiction. *See* 28 U.S.C. §§ 1331 & 1332.

> It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them, Erie R. Co. v. Tompkins, 304 U.S. 64 (1938). Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966).

Consequently, since Plaintiff's federal claims have been **DISMISSED**, the Court hereby declines to exercise the supplemental jurisdiction over Plaintiff's state law claims. *See* Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir.1995) ("As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, well before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims."); *see also* Rodriguez Cirilo v. Garcia, 908 F.Supp. 85, 92 (D.P.R. 1995).

## VI. CONCLUSION

Having found that Plaintiff failed to show a manifest error of law, newly discovered evidence, or an intervening change in law in his favor that would warrant granting a motion for reconsideration as to his Fourteenth Amendment claim, the Court hereby **DENIES** Plaintiff's motion for reconsideration (Docket No. 77). Also, after concluding that Plaintiff has no First Amendment claim against Puig, the Court hereby **GRANTS** Puig's motion for summary judgment (Docket No. 84), **DISMISSING WITH PREJUDICE** Plaintiff's federal causes of action and **WITHOUT PREJUDICE** as to Plaintiff's causes of action under Puerto Rico law. Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico this 27th day of September, 2012.

/s/ DANIEL R. DOMINGUEZ
DANIEL R. DOMINGUEZ
U.S. District Judge